## Case No. 6,451.

### The HIAWATHA.

### The CRENSHAW.

[Blatchf. Pr. Cas. 1; [1] 18 Leg. Int. 332.]

District Court, S. D. New York.    Aug. 8, 29, 1861.[2]

PRIZE—BLOCKADE—VIOLATION OF—NOTICE OF.

1. The act of July 13, 1861 (12 Stat. 255), "further to provide for the collection of duties on imports and for other purposes," did not rescind the prior proceedings of the president in authorizing acts of war by the United States, or in establishing blockades of the enemy's ports, or make void captures previously made for violations of such blockades.

2. The act of August 6, 1861 (12 Stat. 319), "to confiscate property used for insurrectionary purposes," is not to be regarded as a legislative determination that a vessel belonging to a citizen of a state in insurrection was not, before the passage of that act, confiscable merely as the property of an insurrectionist or rebel, without an enactment of congress to that end.

3. The pleadings in prize cases should be simple, direct, and free from technicalities.

4. The district courts of the United States have exclusive jurisdiction in prize cases, without restriction to cases of seizures within their territorial dimensions or on the high seas.

[1] [Reported by Samuel Blatchford, Esq.]

[2] [Affirmed in Case No. 6,450, and by supreme court in 2 Black (67 U. S.) 635.]

5. The existing war between the United States and the rebels is a defensive war on the part of the former. No formal declaration of war by the president was necessary to render lawful the means adopted by him to repel the warlike measures of the enemy.

6. A blockade of the enemy's ports is as lawful a means of war, in civil warfare, as it is in a war between nations foreign to each other.

7. Under the law of nations, the rights incident to a war waged by a government to subdue an insurrection or revolt of its own subjects or citzens are the same, in regard to neutral powers, as if the hostilities were carried on between independent nations.

8. Under the proclamation of blockade, of April 19, 1861, it is not necessary to the lawfulness of the capture of the vessel seized for violating the blockade that a warning should have been previously indorsed on her register, where, at the time of capture, she had entered into or escaped from the blockaded port, or possessed knowledge or notice of the blockade.

9. Citizens of the United States levying war against the government of the United States are enemies, and their property captured at sea is subject to confiscation. Persons abiding within the authority of such enemies become enemies because of their residence, without regard to their private sentiments, or the locality of the place of their property.

10. A notice of a blockade, to the officials of a neutral government, is a sufficient notice of it to the subject of such government.

11. The act of egress is as culpable as the act of ingress, when done in fraud of a blockade.

12. On notice of a blockade, a neutral vessel has a right to withdraw from the blockaded port, with all the cargo honestly laden on board before the commencement of the blockade.

13. The acts of a master in breach of a blockade affect the cargo equally with the vessel, if the cargo is laden on board after the blockade has become effective as to the vessel.

14. A warning on the register of a vessel is not necessary to establish notice of a blockade, where actual notice of it to the master or owner is satisfactorily made out otherwise.

In admiralty.

BETTS, District Judge. The bark Hiawatha, the bark Pioneer, the schooner Crenshaw, the bark Winifred, the schooner Hannah M. Johnson, the bark General Green, the brig Hallie Jackson, the ship North Carolina, the schooner Forest King, and the schooner Lynchburg were all captured as prizes of war by various public armed vessels of the United States, and sent into this port in charge of prize crews, consigned to the district judge, to be proceeded against under such captures. They were accordingly committed by the judge to the possession of the prize commissioners of this district, when severally brought before him, and were afterwards libelled by the United States attorney, and were attached by the marshal on process issued on each several libel, and thereupon brought into court. Appearances were entered in court in each suit, and answers and claims were interposed by various claimants, conformably to the practice of the court, and the causes were then placed upon the docket for hearing, and promptly brought to trial in their order at a public sitting of the court.

A vital part of the defences in each of the several suits, interposed by the claimants, consisted of propositions of law and fact common to all the actions, although, beyond these general defences, there were presented points of claim and exception more or less special to each particular suit. To secure a satisfactory discussion of those points common to all the suits, and avoid the labor and procrastination arising from reiterating the debates on the same issues in each individual action, an understanding was adopted by the counsel conducting the causes, and approved by the court, that the arguments covering those common grounds of defence should be virtually limited to the issues made in three cases, the bark Hiawatha, the bark Pioneer, and the schooner Crenshaw, with the reservation of the right to parties in the other suits pending to be heard upon the facts and law peculiar to the suits in which they were specially concerned. [See Cases Nos. 6,450, 11,171a, 17,-873, 6,029a, 5,312a, 5,961, 10,316a, 4,937, 8,-637a.]

It was understood and agreed between counsel, that official documents, correspondence, proclamations and enactments in print, as published by authority of the United States and British governments, by the separate seceded states, and by the Confederate States, should be read and used as evidence without other proof, to wit: The proclamations of the president, of April 15, 19, and 27, and May 2, 1861; his message to congress, of July 5, 1861; the proclamation of Commodore Pendergrast, of April 30, 1861; the correspondence of the secretary of state with Lord Lyons, on the subject of the blockade of American ports, printed by parliament; the secession ordinances and resolutions of the states of Virginia, South Carolina, Louisiana, Florida, Texas, and Georgia; the act of the Confederate government, declaring a state of war with the United States to exist; and the proclamation of Jefferson Davis, president thereof, of April 17, 1861.

Those causes were discussed with distinguished ability and learning, orally and upon written and printed points and briefs, and nine days of the sitting of the court were devoted to hearing those particular actions. They were argued by the district attorney (Mr. E. Delafield Smith) and Mr. William M. Evarts, on the part of the libellants, and by Messrs. Charles Edwards, Benjamin D. Silliman, and Daniel Lord, on the part of the claimants. For six days ensuing, further arguments were addressed to the court on collateral and auxiliary points embraced within those three particular cases, together with occasional supplementary observations upon the main topics also; and very ample and exhausting discussions were added upon the facts and law involved in the other seven causes above named. All these considerations were comprehended in the body of ten suits pending before the court, and were regarded by counsel as essentially pertinent and important to the just appreciation and decision of the respective causes. Those discussions were maintained by the district attorney, by Mr. Woodford, assistant district attorney, and by Messrs. Evarts and Upton, for the libellants and captors, and by Messrs. Edwards, Lord, Wright, Merrihew, Woodman, Mason, Donohue, Burrill, and Whiting, for the respective defendants and claimants.

After the hearings in the above suits were terminated, Mr. Lord produced and read in court the act of congress entitled "An act further to provide for the collection of duties on imports and for other purposes," approved July 13, 1861, which was then found just published in the newspapers, and submitted to the court that the true import and effect of the act was to counteract and rescind all the proceedings of the president in authorizing acts of war on the part of the United States, or in establishing the blockades of ports, or the seizures or captures referred to in the pleadings and proceedings in those several suits, and that the statute amounted to conclusive proof that those acts of the president were without authority of law, and invalid. Whilst the decision in these several causes was in course of preparation, Mr. Silliman, with the consent of the district attorney, enclosed to me a copy of an act of congress entitled "An act to confiscate property used for insurrectionary purposes" [3] (cut from a newspaper), but the date of the approval of which, if ever made, is not stated (and I am inclined to the opinion that the bill was included, with other provisions, in an act of like title, passed at the close of the session, a copy of which has not yet been furnished me), as being a clear exposition of the law, and amounting to a legislative determination that the vessel now on trial was not confiscable merely as the property of insurrectionists or rebels, without an enactment of congress to that end. It is observable that no express declaration is used, in either of the above enactments, that it was the purpose of congress to give those acts a retrospective or retroactive effect, or to pronounce a legislative opinion upon the true purport and scope of municipal or public law in reference to those subjects, as it then existed. As the statutes were passed in the light of the antecedent acts of the president, and with full knowledge of the consideration upon which those acts were founded, and of the assertion by the executive of their imminent necessity and justness, as measures conducing to the support of the national defense and existence, and the enactments, in terms, no way disclaim or disapprove of the action of the executive in respect to those measures, the implication, in my judgment, would be that the intent of congress was to signify an implied sanction to the employment of the powers used by the president, rather than to disaffirm or rescind the policy or provisions of the measures

---

[3] [See 12 Stat. 319.]

adopted by him. It is the established rule of construction to interpret statutory law as taking effect from the time of its passage, and not as varying the law or its administration by retroactive operation. Matthew v. Zane, 7 Wheat. [20 U. S.] 211; 1 Kent, Comm. 455, notes. If a statute may avail retrospectively in any description of cases, it would seem that the purpose of the legislature to give it such effect should be manifest in the terms of the act, or be unmistakably deducible from the intent of the enactment and its policy. Id. 456, note b. But it does not seem to me it can rightfully be claimed that there is any legal incongruity with the propriety of previous administrative acts performed by the executive, of high moment and exigency, in his opinion, although congress may subsequently appoint a precise law for future occurrences of a like nature; nor that such enactment of a permanent law would draw after it a doubt of the validity of the executive acts previously performed under the pressure of a political and public necessity; nor that a law declaratory of the rightfulness or invalidity of those acts would control the interpretation in a court of justice of the authority previously used. Id. In my opinion, however, neither of the acts referred to is to be interpreted as countervailing or derogating from any powers exercised by the president before their passage, and which were within his official competency; nor were those acts passed by congress with intent to have such effect. The pleadings in all the cases seem to have been constructed on a common understanding, and they essentially put in contestation the main features of fact and law which afford grounds of prosecution and defence in a prize court upon the subjects now in litigation here.

The matters debated in exception and bar to all the suits may be classed under five general heads: 1. That this court, as a prize court, or otherwise, has no jurisdiction over the actions. 2. That the public disturbances now subsisting throughout the country, or between different portions of the United States, do not constitute a state of war, carrying with it the consequences or incidents of public war, under the public law or law of nations. 3. That no lawful blockade has been established by the government of the United States against any port within the United States; nor has a blockade been maintained conformably to the rules of the law of nations, or been violated against such rules, within the United States. 4. That no particular state, or number of particular states, or the citizens or inhabitants of particular states, can become or be treated as enemies of the United States, by government of the latter. 5. That the president of the United States has no power, without authorization by congress, to create or declare a state of war with any state or states of the United States, or to establish a blockade of any port or ports within such state or states.

It is not attempted, in this summary of the

points raised in bar of the suits under prosecution, to reproduce the objections with the formalities under which they were presented. It is, however, intended that all grounds of defence embraced within all the causes of action alleged in the libels shall be distinctly met and disposed of by the judgment of the court.

Proceedings in prize courts are subject to different considerations from those in the instance courts of admiralty (The Athol, 1 W. Rob. Adm. 380), and may be framed with great simplicity and directness (2 Wheat. [15 U. S.] Append. 19). An averment that the capture was prize of war would, in ordinary instances, be sufficient fulness of pleading to call out the defences of claimants against the seizure. The Fortuna, 1 Dod. 81. A like freedom from technical formalities, or diffusiveness in pleadings in defence, is allowed and encouraged in prize proceedings. The libels now under consideration have adequate amplitude of averments to cause condemnation of the property seized, if it be not protected by the defences set up. The main stress in all the suits, therefore, lies in the defensive matters put forth against them.

The objection taken to the jurisdiction of this court rests on the limitation of jurisdiction over civil causes of admiralty and maritime jurisdiction to cases of seizures within its territorial dimensions, or on the high seas. 1 Stat. 76, § 9. The constitution of the United States confers upon the judiciary cognizance of all cases of admiralty and maritime jurisdiction. Const. art. 3, § 2. In 1794, the supreme court, after hearing a protracted argument, decided that the district courts possess, under this grant in the constitution, all the powers of a court of admiralty, whether considered as an admiralty court specially or a prize court. Glass v. The Betsey, 3 Dall. [3 U. S.] 16; Penhallow v. Doane's Administrators, Id. 97; Jennings v. Carson, 4 Cranch [8 U. S.] 2. Under the English jurisprudence, prize cases appertained to the jurisdiction of the admiralty court, as a part of that system,—Le Caux v. Eden, 2 Doug. 594, note—[Lindo v. Rodney, 2 Doug. 613, note],[4] although the authority of the admiralty judge to hear and determine prize causes depended entirely upon independent and separate commissions issued to the judge,—2 Chit. Gen. Prac. 538, c. 5, § 12. That doctrine in respect to the admiralty was also applied to our system by the supreme court, in the decision above cited, before congress had designated the tribunals which should specially take cognizance of the prize branch of admiralty jurisdiction. Since that time the appointment of that jurisdiction by congress is made exclusively to the district courts, without any restriction to territory or place. 2 Stat. 759, 761, §§ 4, 6. And more recently the doctrine is declared that the admiralty courts possess the instance and

---

[4] [From 18 Leg. Int. 332.]

prize jurisdiction. Jecker v. Montgomery, 13 How. [54 U. S.] 498. The practice only in the prize courts, after it takes cognizance of the case, is to be "as in civil cases in admiralty." Wheat. Mar. Capt. 273. The exception to the jurisdiction of the court is, accordingly, overruled.

The other general propositions brought under consideration in these proceedings respect essentially the acts of the president of the United States, and their nullity towards proving a state of public war to exist between the United States and the insurgent and rebel forces now carrying on hostilities against the United States and its government; and the other various branches under which the defences were discussed may well be comprehended in the general topic respecting his powers as chief magistrate, particularly as no point of moment is further contested in respect to the blockade, except in regard to the adequacy of notice, and that particular point in the defences may be deferred to the cases in which it specifically arises. It is insisted, on the part of the defences, that the president, under the constitution, had no power, upon the facts before the court, to institute, declare or recognize, by executive acts, a condition of war between the United States and the insurgents and their forces, which will carry with it, in behalf of the United States, the incidents of a public war in relation to their enemies in the contest, and also to neutral nations, as between them and this government. As consequent to that position, it is urged that the steps taken by the president to establish a blockade of ports in the possession of the insurgents are inoperative and void to that end, because the insurgents cannot be, within the meaning of the public law, enemies of the United States, but are only citizens of the same country, in a state of internal and domestic contention; and because the president had no authority, under the constitution and laws of the United States, to declare and impose a blockade of any port or place, and particularly not of one within the limits of the United States; and, further, that the preliminaries and conditions indispensable to a valid blockade, by the law of nations, have not been observed and fulfilled in any of the cases now on hearing.

It is first to be observed, in respect to the general bearing and features of these defences, which seem grounded on the assumption that the president initiated and inaugurated the war against the rebels or insurgent enemies, that no public or private document, or official act of the president, is given in proof, conducing to show that the existing state of hostilities was produced by any authority or act of the government of the United States. The war, so far as the government has been proved to be an actor in it, and so far as the evidence characterizes it, has been wholly defensive, and in protection of the property and existence of the government itself, and in no particular, up to the captures in question, did it partake of the character of an offensive and aggressive war, in its conduct on the part of the United States. The question pressed earnestly during the discussion, whether the president can, without the authority of congress, declare or initiate an offensive war, becomes, therefore, merely speculative, on the merits of this debate. The inquiry is, if he is, by the constitution and laws of the country, clothed with power to defend the nation against an aggressive war waged for its extermination by internal enemies; and, if so, what public condition in relation to the belligerents and neutral powers results from such warfare.

Much stress has been laid, in the progress of the argument, on the want of an open declaration of war by the president previous to his adopting and employing forcible means to repel or counteract warlike measures of an enemy persisting in hostile attacks on the government and its property. No one can claim, as a right, that a public declaration of war shall be promulgated, unless it be the nation by whose government it is made, and then it serves only as a notice to their own citizens and subjects. The declaration by manifestoes, heralds, or nuncios does not constitute war, and the omission of the declaration can in no way impair its justness or efficacy, especially in a case of defensive war. 1 Kent, Comm. 51, 54; Wheat. Mar. Capt. 13, 15; The Eliza Ann, 1 Dod. 247; Dup. War, cc. 1, 2. A civil war of alarming proportions was waged with extraordinary forces and activity. To promote the public defence, and impair the resources of the enemy, the president proclaimed the blockade of the ports referred to in the pleadings and proofs before the court. If the competency of a foreign government to question, in a prize court, the power of a belligerent to institute a blockade, be conceded, or to do more than exact a strict observance of public law in maintaining and enforcing such blockade by the belligerent who imposes it, I am not convinced by the proofs or arguments adduced in opposition, in the cases on trial, that the lawfulness or efficiency of the blockades established has been impeached. I hold that, in time of civil war and of insurrection and rebellion, the nation assailed and attacked by hostile and rebel forces may as rightfully resist war levied against itself, by closing, embargoing, or blockading ports held by its enemies, as a means of war calculated to weaken and defeat hostile operations to its detriment, as it may accomplish the end by direct force and superior power; and that no sound distinction exists, whether such defensive proceedings are employed in civil, internal, or domestic warfare, or in war between nations foreign to each other. Under the law of nations, the rights, incident to a war waged by a government to subdue an insurrection or revolt of its own sub-

jects or citizens, are the same, in regard to neutral powers, as if the hostilities were carried on between independent nations, and apply equally in captures of property for municipal offences or as prize of war. Rose v. Himely, 4 Cranch [8 U. S.] 241; Id., in circuit court [Case No. 12,046]; Hudson v. Guestier, 4 Cranch [8 U. S.] 293; The Santissima Trinidad, 7 Wheat. [20 U. S.] 306.

Commercial ports may, in time of war, through neutral trade, become efficacious allies to a belligerent power having the control or use of them. So far as that aid avails the enemy, it is warlike in its nature, and may be repelled by war means. Blockade is the measure recognized by the law of nations as the appropriate remedy, and that is, in character and operation, peaceful as to neutrals, and only warlike in respect to the enemy against whom it is imposed. The president, as commander-in-chief of the army and navy, is the functionary, under our government, who has, as incident to his office, the power and right to exercise the resisting and repelling means of legitimate warfare whenever the exigencies of the case require them. And it is not to be overlooked that, in selecting the method of restraining the commerce of neutrals with a besieged or beleaguered port, the milder means of blockade is more favorable to them than a peremptory exclusion of their trade by closing the port absolutely. It certainly can be of no consequence whether the ports blockaded belonged technically or in reality to the United States, or were the property of individuals innocent of any warlike purposes against the United States, or of aiding its enemies. It is sufficient if the evidence shows the ports to be under the power and use of enemies of the United States. This use may be an usurped one, and in wrong of the actual proprietary authority of the places. The right of the United States to prevent such use being turned to their prejudice rests not at all upon the character of the true ownership and rightful authority over the places, but on that of their employment by the occupants. Whilst so held by an enemy, they become foreign territory. U. S. v. Rice, 4 Wheat. [17 U. S.] 246. This consideration meets, also, another ground of defence earnestly urged on the part of the claimants, that these various ports which are subjected to blockade are portions of states of the Union, and, as such, a portion of the Union itself, and cannot, therefore, be made, territorially, objects of hostile control, but only of municipal regulation and government; nor that, more eminently, can they become, as countries or people, enemies of the government of which they are constituent parts, because in that relation they also hold an independent sovereignty as states, which cannot be infringed or molested by authority of the United States acting directly upon that independency.

The Union is not composed of subtleties and abstractions. It was formed with the purpose to render it practical and efficacious. The old confederation was abrogated, and a new form of government was created in substitution of it, with a view to free it from the infirmity and vice of leaving its existence in dependence upon the absolute will of the separate sovereignties from which it was composed. It is not to be supposed that the people would perpetuate that prominent infirmity of the old confederation which embarrassed and enfeebled every action of the Revolution, by the interposition of state distrusts and inactions in opposition to the common weal. The manifest purpose of the people, acting through their national representatives in convention, was to constitute and perpetuate a government of national powers, subsisting within itself, and it is not to be implied that there would be retained, in such reconstruction, the very evil of separate sovereignties in the several states, which had prevented and defeated all practical utility in the system then existing, and which, accordingly, was to be abrogated by the constitution. The notion of a government constructed of numerous parts, each part separate and sovereign in itself, and also sovereign against the whole, was never adopted or declared by the founders of the constitution, and probably was not contemplated or comprehended at that day. The officers of the United States government act within particular states to enforce or defend the laws of the United States, the same as if no state demarcation existed. The whole extent of the country is one nation and one government. In respect to the United States and its constitutional laws, there are no state lines, and state sovereignty is a nonentity. McCulloch v. Maryland, 4 Wheat. [17 U. S.] 400. The denominations of states existing for local and domestic purposes are made use of and applied by the insurgents, in the present war, in designation of combinations of persons, disruptured, so far as they had material or political power so to become, from their citizenship of and subjection to the government of the United States, in disavowal and defiance of allegiance thereto, and who, so far as their own purposes and acts can fix their political status, make themselves as alien and foreign from the United States government as if they assumed the name of citizens and subjects of any state of Mexico or of South America. They thus make themselves avowed enemies, and wage war against the United States, to accomplish its dismemberment and destruction. It can be of no consequence under what name or appellation those enemies unite and act—whether as states, Secessionists, Southerners, or slaveholders. They are, in every just contemplation of our system of government, insurgents and rebels against a common government, waging war for its overthrow. The organism of states, which furnishes a form of government for peaceful and domestic purposes, is thus sought to be perverted by

the insurgents into alien sovereignties, which may exercise, under the familiar name of states, independent and coequal capacities with the national government. Such names or pretensions can have no effect to change the intrinsic nature of things, and transform the residents of particular states into anything else than citizens and subjects of the United States, and, as such, subordinate to its constitution and law. Luther v. Borden, 7 How. [48 U. S.] 1. But, by the instrumentality of these pretences, and other means employed, the insurrection has become developed into a hostile power of great magnitude and force, disavowing all unity with, or subordination to, the mother country, and taking to itself the attributes of a distinct nationality. It thus discards all common obligations under the federal government, and, by force of arms, wages war to establish one overpowering that of the parent nation. The insurrectionists become enemies of the United States government by open hostilities waged against it, without losing their subjection to it individually as citizens. Government represses their rebellion and treason legitimately by force of arms and war, because the magnitude and force of the revolt is beyond the control of the law and the civil magistracy. To that end all the constitutional powers of the president, in his capacity of commander-in-chief of the army and navy, may be rightfully called into exercise. The insurgents confront the government in masses of armed men holding fortified posts or ports of trade and general commerce, and they thus become belligerents and enemies of the nation, against whom all the means of war allowed by the law of nations may be rightfully employed, as was held by the supreme court in the case of the St. Domingo insurgents. Rose v. Himely, 4 Cranch [8 U. S.] 241. For the reasons hereafter suggested, I forbear adding further support to this view, by citation of authorities, than a reference to a very few fundamental points, taken generally from decisions in our own courts.

In my judgment, every branch of the general defences set up against these suits is inadequate and insufficient, in law and fact, to bar the prosecutions pending. I consider that the outbreak in particular states, as also in the Confederate States, was an open and flagrant civil war, waged against the United States by the insurgents in the several disaffected states referred to in the pleadings and proofs in these several causes, at the time the several proclamations, also referred to and named, were issued and made by the president (Wheat. Int. Law, pp. 57–60; Id. p. 343, § 7; Vatt. Law Nat. bk. 3, c. 18, § 292); that such insurrection was maintained by warlike means and forces too powerful to be overcome or restrained by the civil authority of the government; that it was a state of war, and the government could rightfully resort to the rights and usages of

war to maintain itself and defeat the opposition (Luther v. Borden, 7 How. [48 U. S.] 45); that it became lawful and necessary to resist and repel hostilities so levied against the United States and its laws, by aid of the army and navy of the United States; that the president possessed full competency, under the constitution of the United States and the existing laws of congress, to call into service and employ the land and naval forces of the United States in the manner they were used by him, for the purpose of maintaining the peace and integrity of the Union, and putting down hostilities waged against it; and that the president had, rightly, power to establish blockades of ports held by those enemies, and to enforce such blockades pursuant to the law of nations (Kent, Comm. 144).

It is strenuously insisted that, under the proclamation of the president, a vessel is not subject to capture for violation of a blockade unless there has been a previous warning indorsed on her register by a commander of a blockading vessel at the port whose blockade she attempts to violate, and she shall afterwards attempt to enter or leave the same blockaded port. In my opinion, the provision in the president's proclamation of April 19, 1861, referred to on the argument, is not to be construed as a condition absolute, governing all instances of an effort by neutrals to break a blockade, but imports that the vessel so to be warned must have been arrested in innocently attempting to do the forbidden act, and will not apply in cases where a vessel has, at the time of capture, perfected the prohibited attempt by effecting an entrance into or escape from a blockaded port, undetected until the unlawful purpose has been accomplished. The universality and justness of the rule of the law of nations, that the breach of a blockade, with knowledge or notice of its existence, subjects the property so employed to confiscation, is stated by Lord Stowell, and commended with great force and emphasis, in the case of The Columbia (an American vessel) 1 C. Rob. Adm. 154. He says that, "Among all the contradictory positions that have been advanced on the law of nations, this principle has never been disputed. It is to be found in all books of law, and in all treaties; every man knows it; the subjects of all states know it, as it is universally acknowledged by all governments who possess any degree of civil knowledge." Kent, Comm. 144; Hal. Int. Law, c. 20, §§ 16–24; 2 Wildm. Int. Law, c. 4. The common rule of the law of nations will, accordingly, be deemed to prevail, when not expressly abrogated by treaty or edict of the power seeking to enforce it.

Citizens of the United States levying war against the United States are enemies of the government, notwithstanding their residence within the Union; and the property possessed and held by them thus becomes property

of the enemy of the government, subject to confiscation when arrested at sea; and persons continuing within the authority and dominion of such enemies are clothed with the character and responsibilities of enemies, because of their residence, without regard to their private sentiments, or the territorial locality of the place of their hostility. 1 Kent, Comm. 74, 76; The Chester v. The Experiment, 2 Dall. [2 U. S.] 41; Jecker v. Montgomery, 18 How. [59 U. S.] 112.

Contemporaneously with the institution of these suits, a trial was had, and a condemnation made in the admiralty court, sitting within the District of Columbia, of the British schooner Tropic Wind, captured as prize of war, for violating a blockade of the ports of Virginia, proclaimed by the president, and on that hearing judgment was rendered by the court, confiscating the vessel and cargo for that cause. [Case No. 14,187.] On the 23d of July last, in a suit pending in the district court for the Eastern district of Pennsylvania against the ship General Parkhill [Id. 10,755a], seized as prize for a breach of the blockade of the port of Charleston, and also as being the property of residents of Charleston, enemies of the United States, the ship and cargo were, for the latter cause, condemned and confiscated by the court.

In one or the other of those two actions the general defences relied upon before this court, in the classes of suits now on hearing, were, in effect, set up by the claimants, and were there considered and decided. Those courts exercise co-ordinate authority with this court over the subject-matter of the respective suits, and the causes decided are subject to review by a like course of procedure, and before the same ultimate tribunals. It would accordingly comport with the stability and influence of judicial proceedings, in case the decisions already made on these main points are not palpably erroneous in point of law or fact, to avoid a conflict of adjudication between courts of co-ordinate jurisdiction, on propositions of law or fact substantially the same, and whilst all the adjudications are open to review in the same tribunal, where a decision may be speedy and must be final. I did not have the advantage of reading an official report of the decisions in the case tried at Washington, on the hearing of these causes. I have since obtained a newspaper copy of it, which, I presume, is substantially correct. The learned judge of the Eastern district of Pennsylvania has favored me with a copy of his opinion rendered since these causes were argued in this court.

The preceding statements evince that the three courts coincide essentially in their determination of all the points made by the respective parties which are of common import and bearing. Those learned courts, in the decisions rendered on the main questions raised there, and coinciding with those passed upon in this court, supported and vindicated the conclusions adopted by them, with an amplitude of research and argument I could not hope to strengthen, and which I can perceive no occasion to reiterate or attempt to re-enforce. I have perused those manifestations of judicial diligence and learning with great gratification and instruction, and hope the varied learning displayed in those judgments may be invoked to the support of the conclusions I have adopted in the cases before me, with no less efficacy than if they had been recapitulated specifically in the body of this decision. I have, for that reason, studiously omitted to cite the numerous quotations made on the argument of these cases by the respective counsel, or collected by my own reading, and, in preference to that course, leave the points on which the three courts concur in their opinions to the very adequate and satisfactory support of the authorities of the books, so abundantly produced in the judgment of the other courts.

After this preliminary survey of the principles supposed to lie at the foundation of all these suits, and to bar their prosecution in favor of the libellants, it may be necessary to look into the specific proofs to ascertain whether the property seized is condemnable, because of its being shown to be prize of war, under the evidence and law governing these prosecutions. Taking up the cases in the order in which they were brought to hearing in court, it appears that the bark Hiawatha, was captured on or about the 20th of May last, by the United States flagship, in Hampton Roads, as prize of war, for an alleged violation of the blockade of the port of Richmond, Virginia, and, on the 27th day of May, 1861, was duly libelled in this court for condemnation as prize, and that various parties appeared and filed in court claims, answers, and exceptions to the libel, on the 18th of June thereafter. The pleadings interposed by the respective parties were, in substance, as follows: The libel; the claim and answer of the British consul, in behalf of the owners of the vessel and a portion of the cargo; the answer and the claim of Robert Colgate & Co., agents of Frederick Parbury & Co., English merchants, for other portions of the cargo; also, the claim and answer of Dubois & Vandervoort, agents of British and foreign owners of part of the cargo; also, the claim and answer of J. A. & T. A. Patterson, agents of British owners of other portions of the cargo; also, the claim and answer of Miller, Mossman & Potts, British owners of the vessel; and, also, the claim and answer of Schuyler & Livingston, agents of O'Brien & O'Connor, British subjects, and part owners of other portions of the cargo; all containing substantially the same matters of defence as the one filed by the British consul, above alluded to. All the foregoing claims and answers deny, in substance, the legality of the blockade of the port of Richmond, knowledge by the claimants of its

violation, and the authority of the master of the vessel to prejudice the rights of the claimants by any unlawful act on his part.

The facts appearing from the documentary proofs and the answers to the preparatory interrogatories established the following case: The Hiawatha sailed from England, despatched and laden by British owners, for City Point, in the port of Richmond, Virginia, with a cargo of salt, and to bring back a cargo of cotton and tobacco from that port, on freight. She was regularly documented as a British vessel, and was commanded and manned by British subjects. She entered the port at Richmond, and arrived at City Point, in that port, on the James river, about sixty miles below the city of Richmond, on the 29th of April. The proclamation of the president, of April 27, announced that an efficient blockade of the ports of Virginia and North Carolina would be established; and the proclamation of Commodore Pendergrast, of April 30, in command of the Virginia station, gave notice that he had a sufficient naval force there for the purpose of carrying out that proclamation. The documentary proof put in evidence by both parties, in connection with that already referred to, will bring into distinct view the facts in relation to the blockade of the state of Virginia, now under particular consideration. The letter of Lord Lyons to Lord John Russell, dated Washington, May 2, 1861, with its enclosures; that of Lord Lyons to Lord John Russell, dated May 4, 1861; and that of Lord Lyons to Lord John Russell, dated May 11, 1861, with its twenty enclosures,—will explain the posture in which the case of the Hiawatha stood at the time of her egress from the blockaded port of Richmond or City Point. The fifth count of the libel alleges that at the time of her seizure the Hiawatha was attempting to leave the port of Richmond, and to violate, and was violating, the blockade of such port; and the proclamation by which it was established, having notice of such blockade. The vessel had passed from that port to the port of Hampton at the time of capture. 1 Stat. 634, § 11. The owners of the bark plead to the libel at large various allegations, some excusatory of the conduct of the vessel in that port, some legal and others diplomatic in character; and, in regard to this particular charge, they deny that the port was under a legal blockade at the time of the seizure of the vessel, and also deny that she violated or was attempting to violate a blockade at the time, or that other evidence of blockade is admissible than a notice indorsed on the register. Numerous other parties, representing the cargo and other interests connected with the voyage, appear as claimants in the cause, and, in substance, take issue upon the charge of a breach of the blockade, as alleged, and also upon the validity of the blockade. The master of the bark, and J. Potts, a part owner, each in his answer to the preparatory inter-

rogatories, denies personal knowledge or notice of the blockade prior to the capture, or that the owners of the vessel had notice thereof; but the master, in his private journal, kept and found on board the bark, under dates of the 14th, 15th, and 16th of May, notes his presence in Richmond and Petersburg on those days, and that he passed a night or more at a public hotel in one of those cities. Letters from persons concerned in freighting and despatching the vessel at City Point, found on board of her, speak of the blockade as severe, and known at the port where she was laden and made sail. The certificate of George Moore, British consul for the state of Virginia, appended to the ship's register, manifest, and bills of lading, bearing date the 15th of May, 1861, is clear evidence that the master of this vessel, and others interested in British trade, had notice of the blockade of the ports of Virginia as early as the 11th of May, and that it would be enforced. The consul supposed fifteen days would be allowed for the despatch of vessels, and that this time would begin from the second of May; but he does not assert any authority for naming that as the true day when the period of limitation was to commence. The evidence shows ample notice of the period of delay, to put all interested on inquiry, and they must be held to assume the risk of making a correct computation of the time. It must be presumed, from the knowledge of the blockade by the British minister, Lord Lyons, and by Consul Moore, resident at Richmond, acquired prior to the 4th of May, that the master of the vessel, and all the shippers of cargo at that place, had received direct notice of the blockade, through their agency, as well as from general notoriety, on or before the 11th of May, and that the master commenced lading his ship on that day, in consequence of such knowledge, with a hope to leave the port within the fifteen days limited.

The inquiry is not pursued further into the details of the proofs on this head, because, from the indubitable rule of law prevailing in the English prize courts, a notice of blockade to the officials of a neutral government is sufficient to the subjects of the neutral nation. Lord Stowell says: "A neutral master can never be heard to aver, against a notification of blockade," to his own government, "that he is ignorant of it." The Neptunus, 2 C. Rob. Adm. 113. Again he says that a public declaration is not necessary to constitute notice of it, and that, if the individual concerned is personally informed of the fact, the purpose of notice is still better obtained than by a public declaration. The Mercurius, 1 C. Rob. Adm. 83. And such is the American rule. 1 Kent, Comm. 147; Wheat. Mar. Capt. 193–199. In this instance every particular necessary to constitute a specific notification of the blockade to the ship, excepting serving it personally on her master or owners, concurred to fix the presumption that full

knowledge of the fact was possessed by her master and one of her owners before acts were entered upon by her in violation of it. The resident minister of the neutral government had official notice; the consul of the nation residing at the blockaded port apprised Lord Lyons on the 5th of May that he had cautioned persons in Richmond, there representing the owners of the ship, against her having the right of egress at that time, except in ballast, but they would not consent to her so going; and, on that evidence, it aggravates the force of the presumption against the integrity of the master and part owner there present for them to deny any notice of the blockade. The warning, if indorsed on the register, would only be evidence in protection if the vessel should again be arrested for the attempt made prior to the date of the warning, and would be evidence for her conviction should the effort be renewed afterwards. There is no ground, in national law or the reason of the thing, for claiming that a neutral vessel may commit the warlike act of violating wilfully a legal blockade if not found carrying on her register a written warning against so doing. The act of egress is as culpable as the act of ingress, when done in fraud of the blockade. The Frederick Molke, 1 C. Rob. Adm. 86; The Vrouw Judith, Id. 151; The Neptunus, Id. 171. Chancellor Kent approves the doctrine of Sir William Scott in these cases, and confirms the reason of it, because, he says, the object of the blockade is not merely to prevent the importation of supplies, but to prevent export as well as import, and to cut off all communication of commerce with the blockaded port. 1 Kent, Comm. 46. On notice that the port of Richmond was under blockade, the Hiawatha, being a neutral vessel, had a right to withdraw, with all the cargo then honestly laden on board, but she could not have a right to add to her cargo after notification or knowledge of the blockade. The British authorities are strict to this point, and the American decisions accord with them, that the privilege of the neutral vessel to leave a port blockaded after her entry is limited to the vessel itself, and her cargo bona fide purchased and laden on board before the commencement of the blockade. Id.; The Comet, Edw. Adm. 32; Olivera v. Union Ins. Co., 3 Wheat. [16 U. S.] 194. The acts of the master of the vessel in breach of the blockade will affect the cargo equally with the vessel, if the cargo is laden on board after the blockade has become effective as to the vessel. Sir William Scott, in The Vrouw Judith, 1 C. Rob. Adm. 151; The Frederick Molke, Id. 88; and The Betsey, Id. 94,—declared the rule to be that a neutral cannot export cargo from a blockaded port, taken on board after knowledge of the blockade. The breach of blockade by the ship will equally affect the cargo on board, unless there be clear proof of the innocency of the cargo, and that it was neutral property at the time the blockade was established. The evidence of that fact is not satisfactory in this case, as to any portion of the cargo, and a strong suspicion rests upon some part of it, that it is enemy property. The whole cargo (cotton and tobacco) being the product of the enemy's country, the evidence should have been made free of doubt by the claimant, that it was shipped before notice of the blockade, or further proof should have been prayed for and introduced to that point. The want of such proof would seem to have prevented the discharge of the vessel by the government, at the instance of the British minister, after her arrest. But, further, in my opinion, the manner of the employment of the ship on this voyage renders the master the agent of the cargo, also, on the shipment on the home voyage. No cargo was laden on the vessel here until the afternoon of the 11th of May, subsequent to the effort of Lord Lyons to obtain from Mr. Seward a relaxation of the limitation of the time of departure with respect to the Hiawatha. That was a point within the scope of diplomatic arrangement, but the accommodation sought for this vessel, both as to her lading and time of departure, in the letter of Lord Lyons to Mr. Seward, of the 9th of May, and the reply thereto, make no mention of the privilege granted her by this government to ship cargo after she received notice of the blockade, and the privilege solicited does not seem to have been accorded by Mr. Seward; and, accordingly, the vessel, if she had taken her departure within the period of fifteen days from the establishment of the blockade, would not have been entitled to export the cargo taken on board after knowledge of the blockade (The Exchange, Edw. Adm. 43; Wheat. Element, 548; U. S. v. Guillem, 11 How. [52 U. S.] 62), without clear proof that the act was honest and fair as to the belligerent rights of the captors. Upon the proofs the vessel herself did not commence her outward voyage until the 16th of May, if unloosing her fasts in port be deemed the commencement of the voyage, and she is, accordingly, outside of the fifteen days' term of indulgence. When captured, she had left the port of Richmond and violated the blockade there existing. Her relief is to be pursued, as it was commenced, through equitable considerations addressed to the government, and not upon a legal defence against the suit in the prize court. I accordingly pronounce for the condemnation of the vessel and cargo, because of a violation of the blockade in question.

A point was made and fully discussed, in the course of the trial, as to portions of the cargo being enemy property at the time of seizure. No judgment is given upon that branch of the case. Although it is proper to observe that evidence arises out of the correspondence of laders of portions of the cargo, and other papers connected with the proposed voyage, found on the vessel, as, also, out of circumstances connected with the transaction, which tends to countenance the surmise that measures governing the preparation and ship-

ment were on foot, with intent to cover and protect a portion of the enemy's interests in the goods laden on board, yet these proofs but imperfectly make out probable cause, or just ground of suspicion, that the fact was so. It is considered more advisable to dispose, on this hearing, of the broader and more important issues springing out of the blockade declared, and the liabilities and rights of neutrals under those questions. Should the judgment of this court be affirmed by the higher tribunals, there will be no occasion to litigate the subject further; and, should this decree be reversed, the cause will undoubtedly be sent down from the courts of appeal, with instructions which may probably bring out more distinctly than the present shape of the pleadings and proofs seem to have done, the immunities and rights of the neutral owner or carrier in respect to the goods of an enemy laden on neutral bottoms and for neutral ports, together with the corresponding privileges and responsibilities of captors. I consider that the proofs in the case afford a violent presumption that both the master and the part owner of the vessel, sailing with her, had direct and positive notice of the blockade before they commenced taking cargo aboard, and that they afterwards proceeded to lade and despatch the vessel, with intent to evade its operation. I do not regard a warning in writing, indorsed on the register of the vessel, to be necessary to establish notice of the blockade, when actual notice to the master or owner is satisfactorily made out otherwise. The Columbia, 1 C. Rob. Adm. 156. Besides, this vessel was already out of the blockaded port, on her voyage to her port of destination, and turning her away, as it is argued should have been done, with such indorsement, would only be to authorize her to complete the purpose for which she violated the blockade. Sentence of condemnation of the vessel and cargo for a violation of the blockade will be entered.[5]

After the consideration of some intermediary points, arising in the case of the ship North Carolina, the suit against the schooner Crenshaw was the next one brought to hearing. The shape of the proceedings in this cause coincided essentially with that employed in the other suits heard concurrently with it, and the preliminary documentary proofs were the same.

BETTS, District Judge. The libel, in this instance, charges that the schooner Crenshaw, and the cargo laden on board her, were, on the 17th of May, 1861, seized in Hampton Roads by the United States ship Minnesota, under the command of Flag Officer S. H. Stringham, acting under the procla-

[5] The decree in this case was affirmed by the circuit court, on appeal, November 20, 1861. [Case No. 6,450.] The decree of the circuit court was affirmed, on appeal, by the supreme court. 2 Black [67 U. S.] 635, 678.

mation and instructions of the president, and that, at the time of the seizure, the schooner was attempting to leave the port of Richmond, then being under blockade, and to violate such blockade, and thus became, with her cargo, subject to confiscation. The libel also charges that the vessel and cargo were, at the time, owned by residents of the state of Virginia, and enemies of the United States, and thus became lawful prize.

Answers and claims were filed on the part of Charles H. Pierson, of New York, master of the vessel, as agent and carrier, on behalf of the owners of the vessel and cargo, of Richmond, Virginia; of Richard Irvin, Alexander Proudfit, James S. Wetmore, and Alexander P. Irvin, on behalf of themselves, and James A. Scott and Maxwell T. Clarke, all citizens of the United States, and the two last named residents of Richmond, Virginia, to thirty tierces of tobacco strips, part of the cargo; and of Laurie, Son & Co., of Scotland, British subjects, to ninety-one hogsheads and thirty-nine half-hogsheads of tobacco, part of said cargo; and of Henry Ludlum, a citizen and resident of Newport, Rhode Island, and G. F. Watson, now in Virginia, both doing business lately at Richmond, in said state, under the style of Ludlum & Watson, and the said Ludlum also doing business in the city of New York, with Gustav Heineken, under the style of Ludlum & Heineken, and the partners composing the firm of Charles Lear & Son, of Liverpool, England, through the said Ludlum & Heineken, intervening, as their agents, claiming ten hogsheads of tobacco strips, part of said cargo of said schooner; and also of John Caskie and James H. Caskie, owners of one hundred and eight hogsheads and forty-seven half-hogsheads of tobacco, part of the cargo of said vessel. These claimants do not aver that they are not citizens and residents of Richmond, in the state of Virginia, nor do they aver that they are the subjects of any neutral government.

This cause is one of the three upon which the merits of the defences to the captures of the ten vessels as prize, all on trial together, were investigated and debated upon points embracing all the grounds upon which the seizures are maintained by the government, and resisted on the part of the claimants. No party intervenes directly as owner of the vessel, to defend her against the arrest. Her master interposes a claim to her, as agent and carrier of the vessel and cargo. This is not a very apt description of the master's relationship to a vessel, and has no apparent pertinency or application to the cargo, as all parts of that are specifically claimed by its respective proprietors. The answers to the preparatory interrogatories and the ship's papers found on board show conclusively that the vessel was owned and controlled by residents in Richmond, Virginia; and one branch of the defence interposed to the prosecution is, that they, being also citizens of the United States, cannot, because of that residence, be

enemies of the United States. The vessel was registered in the names of the respective owners, as residents of Richmond, the 17th of April, 1861, and a clearance was given at the same place by the Confederate States, May 14, 1861. That topic was considered by the court and disposed of in the decision previously rendered on the general subject of the immunities so set up, and which applies fully to the condition of this vessel, and to so much of her cargo as is proved to belong to the enemies of the United States of that class and description. All of the cargo, not being enemy's property, which was not shipped with intent to evade the blockade then established at the port of Richmond, or was not placed under the charge of the master in such manner as to render him in law the agent of its owner, in attempting to evade the blockade, is entitled to be freed from the arrest and restored to the honest owners, neutrals, or residents within loyal states of the Union. The evidence furnished from the interrogatories in preparatorio, the test oaths and the shipping papers, is relied upon as proving that the cargo was honestly the property of neutrals or loyal citizens of the United States, resident out of any state in insurrection and rebellion, and in a state of war against the government.

Considering the proofs in the order in which the claims have been interposed, the first one is the claim to thirty tierces of tobacco strips, by Irvin & Co., in their own behalf and that of Scott & Clarke. The allegations of the libel are, that the cargo of the vessel is subject to condemnation as prize of war, both because it belonged to enemies of the United States, and because of its exportation in violation of the blockade subsisting against the port at the time of its departure, of which the claimants had notice and knowledge. The claim filed by the claimants alleges that all the claimants are citizens of the United States, and that Scott & Clarke are residing in Richmond, Virginia, and asserts that the other claimants are residents in New York. No proofs were given of these facts, but they were acquiesced in as true by counsel on both sides. It was not denied that the claimants had a partnership interest in the cargo purchased and shipped on their account, but it was insisted that they were no more than payers of the consideration or purchase price, and that there was no partition of the same, the whole property belonging to the claimants, and that the Richmond parties or co-proprietors obtained no property until after adjustment of the transaction, and that accordingly there was nothing seizable in the case at the time of arrest. The interests of the claimants described in the claim, became common and perfected from the incipiency to the termination of the adventure. Scott & Clarke, residents in Virginia, were the purchasers of the property, and the shippers of it from the place of purchase to agents in England. The other members of the concern, residents in New York, were to collect and realize the products of the consignment, and, after the charges of the transaction were adjusted, the net proceeds were to be shared between the two branches of the association,—one in Richmond and the other in New York. There was no contingency or reservation which prevented the contract from being a completed one of purchase and sale, except a possible right of stoppage in transitu, in case the consideration money should be unpaid.

It is to be implied from the statement in the answer or claim that the property passed directly, on its sale by the vendors in Richmond, to the claimants, the actual vendees; and more particularly so, as, by the bill of lading, it was consigned to their common agents in England, to be sold for their mutual advantage. This would constitute a joint ownership of the tobacco in all the claimants. There would thus clearly be a right of property in Scott & Clarke in their share of this shipment at the time of its capture, the value or amount in money only remaining to be ascertained by actual sale in market abroad. This was then a joint property in the copartners, their shares in which were not exempt from condemnation, because of its partnership character. The Franklin, 6 C. Rob. Adm. 127. The court would admit further proof in behalf of the other parties, copartners, to discriminate their shares of the joint partnership, and allow them to seek its restoration on that ground, were they neutral copartners and entitled to hold commercial intercourse with the enemy's port for the purpose of acquiring property, anew by such dealings, or to withdraw property of their own, then being in power of the hostile country. But citizens and subjects of the capturing nation are interdicted all trade, or dealing with the enemy or at his ports for any purpose or object in time of war. Wheat. Mar. Capt. c. 7. The tobacco purchased by the claimants and claimed in this case was bought by the claimants from the enemy after the commencement of the war. It was produced from the soil of the place of exportation. That impressed most distinctly upon the property a hostile character independent of the place of residence of its vendor or purchasers. 1 Kent, Comm. 73; Wheat. Mar. Capt. c. 7. Not only is property taken trading with the enemy liable to forfeiture, but it is subject to forfeiture as prize of war. Id. 219. Moreover, the seizure of this property was on the sea, after it had left its port of departure in an enemy's bottom. There is not, therefore, upon the facts of this case, any legal vindication of a right to this property established on the part of any of the claimants before the court, nor, on the rule adjudged to govern this case—that a lawful war of defence was subsisting at the time of capture on the part of the United States against the insurgents or citizens of

Virginia—have the claimants, or either of them, a capacity to controvert the rightful seizure and condemnation of this property. If Samuel Irvin and Peter Forbes, of Liverpool, England, composing there the firm of Samuel Irvin & Co., have any other or further interest in this transaction, pleaded in the defence of this suit, than that of brokers or agents between or in behalf of the parties before named, resident in Richmond and New York, who procured this property in Richmond to be consigned to Liverpool under the arrangements set forth, those Liverpool parties have not intervened in this suit and brought their rights and equities before the court. They are neutrals, and, if litigant parties in the cause, would have a right to raise the question of the validity of the blockade alleged in the libel, and demand the judgment of the court upon that point. That matters in respect to others of the claimants were so blended with the particular issues in this action, that the court was necessarily compelled to hear and investigate the subject; but the direct right between the libellants and these individual claimants does not, upon the issues, demand or authorize the court to adjudge the validity or invalidity of the blockade declared against the ports of Virginia. Upon the issue it is found by the court that the thirty hogsheads of tobacco strips, charged in the libel to be forfeited, as prize of war, and claimed in this suit by the claimants, were, at the time of seizure, wholly the property of the enemy, and lawful prize of war, and a decree of condemnation and sale is to be rendered against the same. The case, however, having been fully discussed on both issues, the magnitude of the questions and property involved in this suit renders it expedient to so dispose of both branches of the controversy that the parties concerned may have the opportunity, in a court of appeal, for a revision of the judgment of this court. I add to the determination above announced the further decision, that, in my opinion, if either of these parties claimants shall be afterwards adjudged competent to litigate the lawfulness and sufficiency of the blockade and the question of its violation, there is adequate evidence of its intentional violation by the claimants after notice of its establishment.

In addition to the documentary proofs previously adverted to, the domicile of these claimants, and their personal relations to the voyage and cargo, supply circumstances amounting to presumptions of high force, that they knew that the port was in a state of blockade immediately on the proclamation of the fact by Commodore Pendergrast on the 30th of April last. The vessel sailed from New York for Richmond April 19, passed Old Point Comfort the next day, and entered James river the 21st, and arrived in Richmond the 23d of April, as appears by the log of the vessel. On the 27th of April she finished unlading her cargo, and then, as appears by the log, lay idle in port, employed only on small and occasional jobs, in cleaning, painting, or putting the vessel in order, until May 13, when the entry in the log is in these terms: "At 12 m. orders came down to load for Liverpool, England. At 1 p. m. commenced loading with a cargo of tobacco, working until 10 p. m." On May 14 the entry is: "All hands employed at loading; continued work until 1:30 a. m. next morning, as we had no time to spare, (—— ——) which took effect on all vessels clearing after the 15th of May." On the 15th the vessel "finished loading at 10 a. m., and hauled down through the locks, and at 7 p. m. started down the river." Even if this leaving the locks to proceed down the river were to be regarded as an egress from the port, it was not within fifteen days from the 30th of April. It is obvious that implicit confidence cannot be reposed in this period being the real time of getting the vessel under way, from the paper representation of the commencement of the voyage, as the manifest and clearance were passed at the Confederate custom-house on the 14th of May, before the cargo was taken in, according to the log, and because the log further shows that the vessel had to anchor at Day's Point the night of the 16th and be searched by public officers, before she was allowed to depart from the port. Manifestly the answers of the master and the mate to the preparatory interrogatories are reserved and disingenuous as to the fact of notice or knowledge with them of the existence of the blockade before the vessel commenced taking in cargo on the 14th of May. The master answers positively that he did not know or have notice that the port was in a state of war, or was blockaded by the United States. He did not know that the state of Virginia was in rebellion. The mate answers that he knew Virginia had seceded, but did not know, from any legal or official notice, that there was a blockade. He knew it virtually, but not officially or legally. The entry extracted from the log of the 14th of May—imperfect, it is to be presumed, accidentally—still leaves the sense plain enough, that the extraordinary alacrity and exertion of the ship's company to complete loading the vessel on that day, was to avoid the blockade which would take effect after that time.

It appears, by the documents in proof, that Lord Lyons, at Washington, and the British consul Moore, at Richmond, as early as the 2nd and 4th of May, were apprised, from newspapers and other sources of intelligence open to the public, and the fact was freely made known to mercantile men in Richmond, that the ports of Virginia were under blockade. It was a fact of such direct interest and importance to the navigation and trading business of Richmond, that it would be promulgated and known as generally and equally well as the other striking events occurring

simultaneously, of the surrender or capture of Gosport navy yard, and the destruction of the United States shipping and naval stores at that port; the first transaction being on the 20th of April, the day this vessel was passing the site of the navy yard into James river, and the other on the 30th, whilst she lay at her wharf at Richmond, in that river. The startling character of these events, the universal arousing of public attention to each, the moving anxieties which would naturally beset owners, masters of freighters of this vessel, and the immediate vicinity of those persons to the hazard in which she might probably involved, would naturally cause them to become possessed of the earliest knowledge of the condition of public affairs between the United States and Virginia, and particularly of those affecting the condition and safety of this vessel and her purposed voyage. Secession, rebellion, war, and its concomitants, of the capture and destruction of a great seaport and naval depot directly contiguous to Richmond, and at the outlet of the river on which the place is situated, and immediately following those exciting occurrences, the proclamation of a blockade, and the assembling of ships-of-war to enforce it against that individual port, would inevitably affix such a publicity and notoriety to the events, that none of them, in human probability could fail to be known to residents in those localities, or persons having individual or business communications with them. They would bear with them, and spread far and wide around them, the strongest and most impressive notoriety. Notoriety greatly less in degree than that which surrounded the laying of this blockade is always regarded, in prize courts, as evidence entirely sufficient to fasten on parties notice of the existence of a blockade which they are found violating. Wheat. Mar. Capt. 193, 195. I can entertain no doubt, upon the proof produced to this point, that the master of the vessel and the claimants had notice of the blockade of this port at the time, and that the blockade was effective in law; nor is there any doubt, in my mind, that the master of the vessel and the claimants, Scott & Clarke, intentionally violated the blockade. The two latter must also be regarded as sufficiently authorized, from their connexion with their copartners the other claimants, to bind their interest in the cargo also. Beyond that presumption, and the constructive acquiescence by all these claimants in the breaking of the blockade, I think the evidence raises the further presumption of the actual knowledge and assent of the New York partners to the act of the master. The vessel having left the port of Richmond more than fifteen days after the blockade was imposed, and after notice to her of its existence, and the cargo having been laden on board after the blockade, and notice of the claimants thereof, I pronounce the vessel and this portion of the cargo forfeited.

Laurie, Son & Co. intervene in the above suit against the schooner Crenshaw, and claim ninety-one hogsheads and thirty-nine half-hogsheads of tobacco, seized as part of her cargo under the allegations in the above libel. The general defences before alluded to are again interposed, and the defence special to this claim is, that the claimants are neutrals, resident in Leith, Scotland, and that they had no notice of the blockade, and never authorized the master to evade it, and had no knowledge of his intention to do so. The ownership by the claimants of the property claimed, and the fact that they are British subjects, resident in Scotland, is verified by oath, duly made before the British consul at Richmond, on the bill of lading in the cause. The goods were shipped at Richmond by the consignors as belonging to the consignees, the claimants. They are proved to be neutrals. The vessel is an American bottom, and no privity is shown between the consignors of this shipment and the master, or that the master acted as agent of the consignees, or was authorized by them to sail in violation of the blockade. The claimants being domiciled in Great Britain, and having no personal or direct notice, and there not being such lapse of time after the declaration of the blockade as that an actual or constructive notice could be implied against them, there is not, in the judgment of the court, an adequate ground laid for the condemnation of this portion of the cargo. The act of the master in violating the blockade is not to be presumed to have been promoted or acquiesced in by the claimants upon these bald facts. Their goods were freighted on board a general ship at a period so immediately after the blockade was imposed, as to preclude all presumption that the claimants in Scotland could have notice of it. It is, therefore, ordered, that the ninety-one hogsheads and thirty-nine half-hogsheads of tobacco seized in this suit be restored to the claimants. No costs are to be allowed against the captors. The vessel and other portions of the cargo having been condemned for a breach of the blockade, and no fact being before the captors to show a distinction existing between the liabilities to seizure of different parts of the ship's lading, the costs for the arrest of the claimants' interest, in common with the residue of the cargo, are, accordingly, not awarded against the captors.

Ludlum & Watson, lately doing business as a mercantile firm in Richmond, Virginia, under that name, and Ludlum & Heineken, doing business in New York under that firm name, intervene and claim in this suit ten tierces of tobacco strips, forming a part of the cargo of the schooner Crenshaw, seized and prosecuted in this suit, the said Ludlum being a citizen and resident of Newport, Rhode Island, and the said G. F. Watson residing in Virginia, and the firm, lately doing business in Richmond, in said state, under

the style of Ludlum & Watson, claim an interest in part of said ten tierces of tobacco; and the said Ludlum & Heineken also intervene as agents of Charles Lear & Son, of Liverpool, England, British subjects, as part owners of the said tobacco. The claim and answer aver that the tobacco was laden on board the schooner as the sole property of the claimants, and that it still remains their sole property. They deny that the vessel knew or had notice of the blockade alleged, or attempted to evade the same, or that the master of the vessel was their agent. They also make, in substance, the general objections to the libel interposed in the preceding suits. The answer admits that the firm of Ludlum & Watson was doing business in Richmond, and its statement that Watson, one of its members, resided in Virginia, must in that connexion be deemed an admission that he resided at the same place where the business of the firm was transacted. This particular is only of importance in connexion with the presumption, arising from his position, and his being owner and shipper of the goods, that he had knowledge and notice of the existence of the blockade before the goods were shipped, and intended they should be exported in evasion of the blockade. The proofs before referred to satisfactorily establish those facts on the part of the libellants, and not being repelled or explained on the part of the claimants, must prevail against them. Watson being an alien enemy, his interest in the cargo was confiscable for that cause, and that of his partner, Ludlum, was alike subject to condemnation because he acquired the property in an illegal traffic with the enemy. The master of the schooner was not, from his office, in judgment of law, agent of Lear & Son, so as to charge them with constructive notice of the blockade because of knowledge of it by the master. The same conclusion applies to the agency of Ludlum & Heineken, which is not shown to have had any connexion with lading the cargo in Richmond. That act, as appears by the bill of lading, was done by the house of Ludlum & Watson in that port, whilst on the evidence Ludlum's personal residence was in Rhode Island, and no evidence is given by the libellants raising a presumption either that he individually, or the copartnership of Ludlum & Heineken, had any concern with shipping the cargo at Richmond or dispatching it from that port to Lear & Son. In my opinion, accordingly, the claimants, Lear & Son, being neutrals, are entitled to the restoration of their share of the ten tierces of tobacco mentioned in this claim without costs against the captors. But inasmuch as the test affidavit or other evidence does not distinguish the amount of interest claimed in this property by the claimants Lear & Son, nor explain the reason why the whole property was shipped in the name of Ludlum & Watson, and consigned to their order in Liverpool, without any indorsement or recognition of the interest of Lear & Son therein, costs will be adjudged against the said Lear & Son upon their claim, unless further proof, be furnished on their part showing that the property mentioned in their claim was bona fide neutral and owned by them.

John Caskie and James H. Caskie are claimants of one hundred and eight hogsheads and forty-seven half-hogsheads of tobacco, part of the cargo of the Crenshaw, as owners, and allege that they are citizens of the United States, but do not state the places of their domicile or their legal residence. They take issues and exceptions to the libel in substance conforming to those put in by the claimants in the preceding causes, and admit that the vessel sailed from the port of Richmond on the 15th of May, and that she and her cargo were arrested in Hampton Roads on the 17th of May. The bill of lading found on board of the vessel shows that the cargo claimed was shipped by the claimants at Richmond on the 14th of May, 1861; and the implication, in the absence of all proofs or declarations to the contrary, must be that they were at the time domiciled and doing business at that place. This, as already ruled in antecedent cases, constituted the claimants, under the proofs brought into the suit on the part of the libellants, enemies of the United States, and, accordingly, the property is subject to condemnation as enemy's property. Their residence in the port, in the transaction of mercantile business there personally during the blockade, supplies, as has been before shown, satisfactory proof that they had constructive notice of the blockade, and were engaged in the attempt to evade the same by such shipment and dispatch of the cargo in question. Upon both grounds, therefore, I am of opinion that the cargo seized is confiscable, and a decree of condemnation against the same is ordered, with costs.

The decree in this case was affirmed by the circuit court, on appeal, November 20, 1861 [Case No. 6,450]. The decree of the circuit court was affirmed, on appeal, by the supreme court, 2 Black [67 U. S.] 635, 682, except as to the thirty tierces of tobacco strips claimed by Irvin & Co. [See Case No. 6,450, note.]